CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAY 1 3 2016

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| ANTHONY DEWEY SMITH | ) | Case No. 7:15-CV-00183 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | By: Michael F. Urbanski |
| | ) | United States District Judge |
| AUTOZONE, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This case is an overtime payment dispute under the Fair Labor Standards Act, 29 U.S.C.

§ 201 et seq. ("FLSA"). Plaintiff Anthony Smith ("Smith") worked as a store manager for defendant

AutoZone, Inc. ("Autozone") from 2005 to 2015. During that time, Smith frequently worked more

than forty hours a week without receiving overtime. Smith now seeks overtime pay on the grounds

that he was misclassified as an exempt employee under the FLSA.

Before the court are cross-motions for summary judgment. Smith argues he lacked authority

to perform many of the management duties typically associated with store managers, and spent the

majority of his time performing tasks identical to those performed by non-exempt employees. As

such, he claims there can be no genuine dispute that he was misclassified as exempt from the

FLSA's overtime requirements. Conversely, AutoZone claims it is entitled to summary judgment

because the undisputed facts show that Smith was the most senior employee stationed in his store,

exercised significant discretion to direct his staff, and was ultimately responsible for his store's sales

performance. AutoZone believes these facts establish, as a matter of law, that Smith was properly

classified as exempt employee under either the executive or administrative exemption to the FLSA.

AutoZone also faults Smith for attempting to change his deposition testimony through use of a

declaration attached to his motion for summary judgment.

The court held a hearing on April 12, 2016. For the reasons set forth below, the court concludes that AutoZone has demonstrated as a matter of law that Smith qualifies as an exempt executive under the FLSA. Accordingly, Smith's motion for summary judgment, ECF No. 19, is **DENIED**, and AutoZone's motion for summary judgment, ECF No. 21, is **GRANTED**.

## I.

AutoZone operates approximately 5,500 retail automotive parts and accessories stores across the United States. Declaration of William Odom, ECF No. 23-1, ¶ 3 [hereinafter "Odom Declar."]. AutoZone organizes its retail operations into six divisions, which are further sub-divided into regions and districts. Id. Regions are headed by a regional manager, and districts are headed by a district manager. Id. at ¶¶ 3–4. Each district contains approximately seven to fifteen stores, which, in turn, employ a store manager and various other employees. Id. at ¶ 3. Store managers are the only exempt, salaried employees physically stationed in a store on a day-to-day basis. Id. at ¶ 5.

AutoZone hired Smith in 2001, and promoted him to store manager in 2005. Deposition of Anthony Smith, ECF No. 23-2, 18:11–13; 20:20–23 [hereinafter "Smith Depo."]. Smith worked at eight AutoZone stores, including five as store manager, before resigning in February 2015. Declaration of Anthony Smith, ECF No. 20-1, ¶¶ 1–2 [hereinafter "Smith Declar."]. All five stores Smith managed—which included stores in Madison Heights, Lynchburg, Roanoke, Martinsville, and Rocky Mount—were located in AutoZone's Richmond, Virginia region. Smith Depo. 21:2–23:9.[1] The number of employees at each store varied, ranging from six employees at the Madison Heights store to twelve employees at the Lynchburg store. Id. at 55:19–61:14. These employees included sales associates—sometimes called "red shirts"—drivers, parts sales managers, and commercial sales managers. Id. Over the course of his employment, Smith claims he "frequently worked 50 hours

---

[1] During oral argument, the parties confirmed that Smith's duties as store manager were consistent across the five stores he managed. Therefore, the court will collectively consider Smith's work in deciding whether his job duties exempt him from the FLSA's overtime requirement.

per week, consistently worked more than 55 hours per week, and worked at times, for period of more than 70 hours per week." Smith Declar. ¶ 3. Smith received no overtime pay.

However, Smith's salary increased over the course of his employment with AutoZone. In 2005, he earned an annual salary of $40,000, which translated to approximately $769 in weekly salary. Smith Depo. 23:23–24:4. By 2015, Smith was earning $45,000 a year. Id. at 24:5–10. As store manager, Smith was the highest paid employee in his store. Id. at 28:3–5. He was also eligible for an incentive bonus based on the store's sales performance. Id. at 26:16–27:18. The store manager was the only employee eligible for this bonus. Id. at 27:24–28:2.

The record has conflicting evidence about what training, if any, Smith received before becoming store manager. On the one hand, Smith claims he became management certified sometime between 2001 and 2005 as part of an earlier promotion to parts sales manager, and received no additional management training when he became store manager. Id. at 28:6–29:20. On the other hand, Smith later concedes that he completed a training course entitled "A Week in the Life a Store Manager" and received a commercial certification through AutoZone. Id. at 28:16–29:9; 31:3–41:20. He also became certified as a "hiring manager." Id. at 83:20–84:6; 89:5–90:8.

The responsibilities of an AutoZone store manager are varied but extensive. Duties include:

- Staffing and scheduling store personnel;
- Attracting, recruiting, hiring, and training "high caliber store personnel;"
- Managing, analyzing, and reconciling monthly profit and loss statements;
- Monitoring cash flow, inventory, and security control;
- Ensuring all company policies and loss prevention procedures are followed;
- Providing performance counseling and distributing "Autozoner Action Reviews" when required;
- Maintaining sales productivity, store maintenance, store appearance, and merchandising standards; monitoring daily payroll and adjusting schedules accordingly; addressing customer concerns and resolving them "with the goal of turning a complaint into a compliment."

3

Ex. 14, ECF No. 23-3, at 34.[2] Store managers also perform basic tasks like mopping floors, checking out customers, and addressing other retail-related issues. Smith Declar. ¶ 6; Smith Depo. 35:8–15. Smith represents that he spent only 15% of his time performing personnel management, and spent the "majority" of his time doing "retail-related" duties. Smith Declar. ¶ 6, ¶ 9. Further, Jeffrey Powers, Smith's former district manager, avers that store managers like Smith spent no more than sixty to ninety minutes per day scheduling workers, visiting with customers, or otherwise directly managing their stores. Declaration of Jeffrey Powers, ECF No. 20-2, ¶ 5 [hereinafter Powers Declar.]. Nevertheless, Smith was still responsible for managing the store even when he was performing non-exempt duties. Smith Depo. 125:1–6. William Odom, Smith's former regional manager, confirms that Smith helped hourly employees perform non-exempt tasks—including manning the cash register, interacting with customers, stocking shelves, and unloading inventory—but notes that Smith remained responsible for his store "at all times." Odom Declar. ¶ 16.

      To be sure, Smith was subject to significant oversight from his district manager. Smith had at least four district managers and two regional mangers during his time at AutoZone. Smith Depo. 117:4–122:22. District managers made on-site visits to stores under their supervision, but were not physically stationed in any specific store. Some district managers visited Smith's store four to five days out of a five-day week, while others were present only two days out of a five-day week. Id. In addition, Smith had brief phone conversations with his district manager, sometimes as frequently as multiple times a day, and other times as infrequently as a few times per week. Id.; Smith Declar. ¶ 35. The frequency of Smith's contact with his district manager depended on that district manager's management style and whether Smith's store was meeting corporate sales goals. Smith Depo. 118:12–120:20. Regional managers would visit approximately once a month. Id. at 120:9–19;

---

[2] Various exhibits referenced in Smith's deposition are attached to AutoZone's motion for summary judgment. For ease of reference, the court will use the page numbers provided by the CM/ECF system, rather than the page numbers of the original document, when citing these exhibits.

122:6–22. Each Monday, Smith also participated in a "Management Action Plan" conference call with his district manager and other store managers in his district. Id. at 35:22–36:12. During this call, Smith discussed sales results, identified upcoming store activities, and shared his next-steps to improve store performance. Id. at 36:9–37:10.

Smith acknowledges that his job was to manage his store, that he had discretion to delegate tasks to other employees, and that he was ultimately responsible for his store's performance. Id. at 35:16–18; 61:20–22; 91:1–3. Smith was also evaluated on his store's sales numbers, his ability to manage personnel, and his staff's compliance with AutoZone's corporate policies. Id. at 90:6–101:23. In fact, at least one of Smith's former employees—who was later promoted to store manager—agreed that Smith was a "leader in [his] store." Deposition of Lawrence Harris, ECF No. 23-6, at 29:15–22 [hereinafter Harris Depo.].

However, AutoZone vested considerable authority in its district managers, and many decisions were divided between store managers and their district managers. For example, Smith had authority to identify outside contractors to handle basic maintenance—including snow removal or lawn care—but had to seek approval from his district manager before entering any service agreement. Smith Depo. 70:8–71:13. Similarly, Smith was trained to select and interview new hires, sought out candidates for his store, and conducted initial interviews after reviewing applications on AutoZone's online "E-hire" system. Id. at 83:3–85:24. Yet, he could not hire or promote store employees without approval from his district manager. Id. Further, Smith ensured new hires completed required training on AutoZone's corporate policies, monitored their compliance with those policies, oversaw employees' interactions with customers, resolved customer complaints whenever possible, and filled out performance evaluations on employees he supervised. Id. at 71:15–72:15; 78:22–79:1; 102:21–105:22. Once again, however, the district manager had ultimate authority over employee discipline and pay raises. Id. at 107:13–108:6; 110:4–112:19. Smith

5

recounts several instances in which he notified his district manager of employee misconduct, and was then instructed on how to address the situation with the employee. Id. at 110:4–112:19. He also estimates that his hiring recommendations were accepted over 50% of the time, his recommendations on pay raises were followed 30% of the time, and his recommendations for promotion were followed "less than half the time." Id. at 33:9–34:6; 85:3–13; Smith Declar. ¶ 14. In those instances where his district manager did not follow Smith's recommendation to hire a particular employee, it was often because the applicant failed a background check. Smith Depo. 85:11–86:22.

Responsibility for inventory management was also divided between store managers and their corporate superiors. Using historical sales data, AutoZone determined the type and amount of products to ship to individual stores. Id. at 68:2–6. Store managers had discretion to order additional items from the warehouse if they believed it necessary; for instance, Smith could order extra salt for his store if his location was expecting a snowstorm. Id. at 68:13–22. Smith was required to complete an inventory matrix each week and reviewed profit-and-loss statements detailing the financial status of his store. Id. at 62:6–13. Smith also had authority to approve customer product returns within a certain price amount, though large or unusual returns required district manager approval. Id. at 73:6–76:8. Further, Smith was responsible for reinforcing AutoZone's loss prevention procedures to prevent theft, and monitored employees as they completed transactions at the cash register. Id. at 76:9–20; see also Odom Declar. ¶ 14.

Finally, employee scheduling at AutoZone was largely automated. An advanced computer program called "Z-Task" identified the labor hours required for individual stores each week, taking into account that store's sales growth and historical productivity. Deposition of William Odom, ECF No. 23-5, 7:23–9:11; 17:5–10 [hereinafter "Odom Depo."]. Store managers had the ability to upload additional, non-sales assignments into the system—including inventory management or truck

6

unloading—that affected the personnel needed for a store on a particular day. Id. at 8:2–23; 18:17–19:14; 22:9–23:7; 25:4–19; Smith Depo. 65:10–17.

Once individual employees updated their availability in the system, Z-Task created a skeleton schedule that included preliminary shifts for each employee. Odom Depo. 17:11–18:16. The store manager adjusted the schedule to account for employee vacation days, lunch coverage, or other factors affecting coverage. Id. at 14:11–15:17. Store managers then assigned tasks to specific employees. Odom Declar. ¶ 13. All store schedules were approved by a district manager before they became final. Odom Depo. 15:20–16:14. In the event an employee called in sick or was unexpectedly absent, the store manger filled the position himself or with whatever staff was available. Smith Depo. 65:18–66:14. Store managers also handled employee requests for leave. Id. at 66:15–17. However, only a district manager could release employees if a store was not meeting its projected sales on a given day. Id. at 66:18–67:6.

## II.

Pursuant to Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex,

7

477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor.'" McAirlaids, Inc. v. Kimberly-Clark Corp., No. 13-2044, 2014 WL 2871492, at *1 (4th Cir. 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." Anderson, 477 U.S. at 255. However, the non-moving party "must set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). Indeed, the non-moving party must show that "there is sufficient evidence favoring the non[-]moving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the Court must determine that no reasonable jury could find for the non[-]moving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (citing Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 124 (4th Cir. 1990)).

## III.

First, the court must address Smith's alleged use of a sham declaration to support his motion for partial summary judgment. Smith gave a lengthy deposition in this case. However, Smith's motion for partial summary judgment does not cite his deposition. Instead, Smith cites a five-page

8

declaration he executed in support of his motion. AutoZone objects, claiming Smith's later declaration contradicts his prior deposition testimony. Accordingly, AutoZone moves to strike any section of the declaration that contradicts Smith's prior deposition.

The law is clear—a party "cannot create a dispute about a fact that is contained in deposition testimony by referring to a subsequent affidavit of the deponent contradicting the deponent's prior testimony." In re Family Dollar FLSA Litig.[Family Dollar I], 637 F.3d 508, 512 (4th Cir. 2011). As the Fourth Circuit explained:

> If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) (quoting Perma Research and Development Co. v. Singer, 410 F.2d 572, 578 (2d Cir. 1969)). However, "[a]pplication of the sham affidavit rule at the summary judgment stage must be carefully limited to situations involving flat contradictions of material fact." Elat v. Ngoubene, 993 F. Supp. 2d 497, 528 (D. Md. Jan. 21, 2014) (quoting Zimmerman v. Novartis Pharm. Corp., 287 F.R.D. 357, 362 (D. Md. 2012)). Put differently, there must be a "bona fide inconsistency" between an affiant's declaration and his deposition testimony before an opposing party may invoke the sham affidavit rule. Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 n.7 (4th Cir. 2001).

In this case, Smith's declaration is not as contradictory as AutoZone suggests. For example, Smith's declaration states:

> As a Store Manager, I spent a small amount of my time, less than fifteen percent (15%) of my time, performing any personnel management. I did not give that much one-on-one direction throughout the day. While I certainly interacted with subordinate employees regularly, I was not frequently giving directives as a Store Manager.

9

Smith Declar. ¶ 9. AutoZone seeks to strike this paragraph, claiming it contradicts Smith's deposition testimony. But the court perceives no direct conflict between this statement and Smith's deposition. During his deposition, Smith testified generally about his supervision of employees, and admitted that he managed personnel in his stores. See, e.g., Smith Depo. 31:6–62:20. But Smith also stated that his district manager was the final authority on most personnel issues, and testified that he did many non-supervisory tasks. See id. Smith was not asked during his deposition to estimate the amount of time he spent on personnel management, nor did he ever testify that he spent more than 15% of his time managing employees. As such, while the above statement may expand on Smith's deposition testimony, there is no "flat contradiction of material fact" that would invoke the sham affidavit rule. The same conclusion follows for the rest of Smith's declaration.

To be sure, sections of the declaration push the boundary. For example, Smith testified during his deposition that his district manager followed Smith's hiring recommendations 50% of the time. Smith Depo. 85:11–13. Yet, Smith states the following in his declaration:

> Although I may have made suggestions as to hiring, my hiring suggestions were not given particular weight. Although over half of my recommendations for hire we approved, AutoZone needed employees so badly, I felt that my recommendations were not given substantial weight. We needed employees so badly, if my recommendations were given particular weight, it is my belief AutoZone would have hired everyone I recommended. I could not understand why, when we needed employees so badly, my recommendations were not honored each time.

Smith Declar. ¶ 5. This statement is an obvious attempt to explain away Smith's admission that his district manager accepted his hiring recommendations over half the time. Once again, however, the declaration is not technically inconsistent with Smith's deposition testimony. Instead, Smith's declaration merely seeks to supplement his deposition in a way that best suits his cause of action.

Accordingly, the court finds no smoking gun on this issue. On the one hand, Smith's declaration appears to summarize and supplement his deposition testimony in the light most

10

favorable to him. This effort, in some instances, creates potential discrepancies between Smith's declaration and his deposition. On the other hand, nothing in Smith's declaration flatly contradicts his prior testimony. As such, the court finds no reason to invoke the sham affidavit rule and will consider both Smith's deposition and his declaration in ruling on the motions for summary judgment.

## IV.

The court turns next to Smith's substantive claim under the FLSA. Because the court is ultimately persuaded that AutoZone is entitled to judgment as a matter of law, it addresses only those arguments raised in AutoZone's motion for summary judgment and in Smith's opposition to that motion.[3] As such, the court accepts as true Smith's factual description of his duties as store manager and will otherwise draw all reasonable inferences from the record in the light most favorable to him.

The FLSA requires that employees receive overtime pay if they work more than forty hours a week. 29 U.S.C. § 207(a). The statute exempts employees from this requirement if they are "employed in a bona fide executive . . . capacity." 29 U.S.C. § 213(a)(1). Whether an employee is exempt is a mixed question of law and fact: "[t]he question of how the [employees] spent their working time . . . is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law." Williams v. Genex Services, LLC, 809 F.3d 103, 109 (4th Cir. 2015) (citing Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714 (1986)). "Importantly, due to the remedial nature of the FLSA, any exemption is to be narrowly construed." Smith v. Brennan, 115 F. Supp. 3d 691, 698 (E.D. Va. 2015). Further, the fact that a plaintiff is nominally a "salaried" employee is not a safe harbor for defendants. Kennedy v. A Touch of Patience Shared Hous., Inc., 779 F. Supp. 2d 516, 523 (E.D. Va. 2011).

---

[3] Smith did not file a brief opposing AutoZone's summary judgment motion. Instead, Smith rests his opposition on the arguments presented in his own motion for summary judgment. See ECF No. 25.

11

For the executive exemption, the Department of Labor ("DOL") updated its regulations in 2004 to create a four-prong test that defines the scope of the exemption. 29 C.F.R. § 541.100(a)(2004). Under this test, an employee is an "executive" if:

> (1) he is compensated at a rate of at least $455 per week;
> (2) his primary duty is management;
> (3) he customarily and regularly directs the work of two or more other employees; and
> (4) he has the authority to hire or fire other employees or his suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight.

Family Dollar I, 637 F.3d at 512 (citing § 541.100(a)). AutoZone has the burden to show by clear and convincing evidence that Smith satisfies all four prongs. Williams, 809 F.3d at 109; Desmond v. PNGI Charles Town Gaming, L.L.C., 564 F.3d 688, 691 n.3 (4th Cir. 2009). Prong 1 and prong 3 are not in dispute—Smith admits that his salary exceeded $455 a week and admits that he regularly directed the work of more than two employees. Pl.'s Br. in Supp., ECF No. 20, at 10. Thus, the only relevant issues are (1) whether Smith's primary duty is management and (2) whether Smith had the authority to hire or fire other employees or whether his suggestions on personnel decisions were given particular weight.

## A. Management as Primary Duty

AutoZone must first show that Smith's primary duty was management. AutoZone contends that Smith—as the highest-ranking and highest-paid person in his store—was responsible for managing his store at all times and was the person ultimately accountable for the store's performance. As such, AutoZone claims Smith's management duties were essential to store operations. For his part, Smith claims he performed the same tasks as non-exempt employees and argues that AutoZone district managers, not store managers, controlled individual stores.

12

Under the FLSA, an employee's "primary duty" means the "principal, main, major, or most important duty that the employee performs." 29 C.F.R. § 541.700(a). Examples of "management" activities include:

> [I]nterviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102. This list is not exhaustive, and an employee need not perform each activity to satisfy the "primary duty" requirement. Instead, "[a]n employee's 'primary duty' is determined by a totality of the circumstances analysis." Buechler v. DavCo Restaurants, Inc., No. 09-CV-0227, 2009 WL 3833999, at *4 (D. Md. Nov. 16, 2009) (citing 29 C.F.R. § 541.700(a)). Relevant considerations include: (1) the relative importance of the exempt duties as compared with other types of duties; (2) time spent performing exempt work; (3) the employee's relative freedom from direct supervision; (4) and the relationship between the employee's salary and the wages paid to other employees for the kind of non-exempt work performed by the employee. 29 C.F.R. § 541.700(a). None of these four factors are necessarily dispositive; rather, a court must consider them collectively to determine if the employer has satisfied the primary duty requirement. Kreiner v. Dolgencorp, Inc., 841 F. Supp. 2d 897, 904 (D. Md. 2012) (citing Thomas v. Speedway SuperAmerica, LLC, 506 F.3d 496, 505 n.6 (6th Cir. 2007)).

### 1. Relative Importance of Exempt Duties

The first factor considers the relative importance of Smith's managerial tasks compared to his non-managerial work. Courts frame this issue in two ways. First, they look to the "significance of the managerial tasks to the success of the facility." Smith, 115 F. Supp. 3d at 699 (quoting Pollard v. GPM Invs., LLC, No. 3:10-CV-115, 2011 WL 864329, at *6 (E.D. Va. Mar. 10, 2011)). For example, the Fourth Circuit held that a Dairy Queen manager who spent approximately 80% of her time performing non-managerial tasks—such as working in the kitchen—was still exempt because the store "could not have operated successfully unless [she] performed her managerial functions." Jones v. Virginia Oil Co., 69 F. App'x 633, 638 (4th Cir. 2003). These "managerial functions" included ordering inventory, handling customer complaints, checking inventory, and counting daily receipts. Id. Second, some courts look to a "manager's training, evaluation[s], and factors affecting eligibility for bonuses and pay raises" to determine the importance of an employee's exempt duties. See Mayne-Harrison v. Dolgencorp, Inc., No. 1:09-CV-042, 2010 WL 3717604, at *20 (N.D.W. Va. Sept. 17, 2010). These courts reason that activities that affect a manager's performance evaluations and bonus eligibility shed light on which tasks an employer values most from that particular employee. Id.

In this case, the record shows that Smith performed many of the duties described as "managerial" by the Department of Labor. He recruited and interviewed new candidates for his store, ensured employees completed required training, finalized shift schedules, delegated daily tasks, handled unexpected labor shortages, reinforced loss prevention procedures, monitored cash register transactions, and addressed customer complaints. Smith Depo. 68:13–72:15; 76:9–79:1; 90:21–91:3; 102:21–105:22. He also informally resolved employee disputes, coached employees on corporate policies, reported employee infractions to his district manager, issued written corrective actions when ordered to do so, completed annual performance appraisals, and otherwise acted as the "eyes

14

and ears" of his superiors on personnel issues. Id. at 71:15–72:15; 78:22–79:1; 102:21–117:3.

Further, Smith had authority to order additional inventory when he believed it necessary, though he claims this happened "once a month or less." Id. at 68:13–22; Smith Declar. ¶ 29. Finally, Smith developed plans to improve sales performance in preparation for the weekly conference calls with his district manager, and was responsible for completing an inventory matrix and reviewing his store's profit-and-loss statement—tasks which Smith described as non-delegable. Smith Depo. 35:22–37:10; 62:6–13. Though Smith eschewed being described as the "captain of the ship," id. at 39:6–40:2, at least one of his former employees agreed that Smith was a "leader" in his store. Harris Depo. 29:15–22.

In addition, Smith's bonus and performance reviews were tied to his management duties. It is undisputed that Smith could receive an incentive bonus if his store met certain sales goals, and that the store manager was the only person in the store eligible for this bonus. Smith Depo. 26:16–28:2. Moreover, Smith's annual performance reviews focus on his management skills, including his success in recruiting qualified staff, improving customer service, and increasing sales. For example, a 2007 performance review encouraged Smith to "[c]ontinue to strive to have the best in-stock position & sharpest store in the city while training, coaching & mentoring your [employees] concerning AutoZone's culture/programs . . . ." Ex. 18, ECF No. 23-3, at 101. The review further stated:

> Anthony your [employees] respect you as a supervisor & a co-worker however be careful they will take advantage for your good nature; you must be tough & fair. Work on your time management & organizational skills, your knowledge of AutoZone's systems & procedures will improve over time. * * * Anthony [c]ommunication is the key to being successful. Be clear with what your goals & expectations are & make sure you hold your [employees] accountable. Delegate more to those that need to step up or step out, then follow-up to ensure they are complet[ing] the assignment[;] if not take action.

15

Id. at 103. A second performance review from 2007 noted that Smith's store was a "broken mess" before he assumed control, and lauded his ability to "put[] the pieces back together." Ex. 23, ECF No. 23-3, at 138. His district manager, Jeffrey Powers, noted that Smith "sat in on regional conference calls & handled [district manager] responsibilities in my absence" and complimented Smith for "grab[bing] the bull by the horns" and "quickly [making] improvement in staffing & execution." Id. at 141–42. The review also identified several areas of growth, with the following typewritten comments from Powers:

> Anthony continue to interview & seek qualif[ied] [employees] to staff your store. Work to recruit bilingual [employees] to better service our customer base & address the niche that our competitors ignore. * * * Anthony, with your next store that has commercial [sales], you must make sure that all your [employees] are focus[ed] on one goal, taking care of both DIY and Comm[ercial] customers. Everybody in management must be able to ring [up] commercial transactions & answer the commercial phone even after normal commercial business hours. * * * Continue to instill AutoZone's culture on a daily basis. Your [employees] must execute the pledge even in your absence. Work to get more [employees] ASE certified to better service your customers. Remember the more qualified your [employees] [the] easier your job will get. * * * Good job in both stores, however continue to train all your [employees] if one fall[s] out another must be ready to take the reins. * * * Anthony you must be all over controlling your shrink. Make sure your management staff executes all of AutoZone's policies & procedures failing audits & bad shrink isn't acceptable.

Id. at 139–40.

Smith's 2010 performance review had similar comments from Powers:

> Anthony has outstanding customer service skills & continues to reinforce them with his [employees]. He honors his commitments & has promoted a culture of thrift at [his store]. He has continued to develop his skills as well as his [employees' skills] throughout the past 6 months. Anthony has a great attitude which has been infectious within his team, they have been able to overcome most obstacles with little more than a studded step. His team is always in the loop. * * * Anthony has accomplished a lot with his team, but has a couple opportunities. (1) Competing in all contests & promos is a must which supports not only the district but also the region. . . . Anthony

16

> must work to motivate his troops to engage & excel on every promo
> or contest.

Ex. 27, ECF No. 23-3, at 154. These performance reviews make it clear that AutoZone valued

Smith's leadership and management skills, and expected him to exercise independent control over a

wide range of activities in his store. In fact, the evaluation criteria addressed in these performance

reviews mirror the expectations set out in AutoZone's formal description of the store manager

position, which portrays a manager's duties as almost exclusively supervisory. Ex. 14, ECF No. 23-

3, at 34.

To be sure, Smith also performed many non-exempt tasks. Smith estimates that he spent

the great majority of his time addressing "retail-related issues such as sales, customer service, and

inventory work." Smith Declar. ¶ 6 ¶ 9; Smith Depo. 35:3–15. These duties are identical to those

performed by hourly employees. However, Smith admits that he had authority to delegate these

non-exempt tasks to his employees when necessary, and likewise agrees that he was simultaneously

responsible for managing the store whenever he was performing non-exempt work. Smith Depo.

35:13–18; 125:1–6. As even Smith concedes, the store manager was the person ultimately

accountable for a store's performance. Id. at 91:1–3.

Even when these facts are viewed in the light most favorable to Smith, the court finds that a

reasonable juror could reach only one conclusion: that Smith's managerial duties were relatively

more important than his non-managerial duties. As the Fourth Circuit has noted, "[w]hether [a

store manager is] collecting cash, filling out paperwork, sweeping the floor, stocking shelves, hearing

the complaint of a customer, working with employees on their schedules, or running a cash register,

[he is] fulfilling [his] task of running the store. *There was no one else at the site to direct these actions.*" See,

e.g., Family Dollar I, 637 F.3d at 517 (emphasis in original). Both Smith's performance reviews and

his own testimony show that his managerial duties were essential to the smooth functioning of his

store. Absent his leadership, new candidates would not be identified, work schedules would not be

17

finalized, tasks could not be assigned and completed, employees might skip required training, and sales would undoubtedly slip. In short, as the most senior employee physically present on a day-to-day basis, Smith was the "glue" that held his store together. On similar facts, multiple courts have found that store managers are critical to a store's success, even when their duties include a heavy load of non-exempt labor. See Thomas, 506 F.3d at 505 ("If [a store manager] failed to perform her non[-]managerial duties, her Speedway [gas] station would still function, albeit much less effectively. After all, most of us—even if unwillingly—have visited and spent our money at filthy gas stations with sparsely stocked shelves. If, however, [the store manager] failed to perform her managerial duties, her Speedway station would not function at all because no one else would perform these essential tasks"); Mayne-Harrison, 2010 WL 3717604, at *21 (citing, in part, evidence that a store manager's bonus was tied to a specific sales quota to hold that her managerial duties were "critical" to the success of her employer); Roberts v. Dolgencorp, Inc., No. 2:09-CV-0005, 2010 WL 4806792, at *9 (M.D. Tenn. Nov. 18, 2010) ("[I]f the plaintiff did not stock shelves, run the register and clean the floors, the performance of the store would certainly be adversely affected; however, if she did not hire clerks, manage employee intake, make a work schedule, assign tasks, train employees, and supervise her staff, the store would cease to function at all."); Haines v. S. Retailers, Inc., 939 F. Supp. 441, 450 (E.D. Va. 1996) (finding that a plaintiff's management tasks were more significant than her non-management tasks because she "received the praise or blame over whatever happened at the store, good or bad"). Accordingly, the court finds that this factor favors a finding that Smith's primary duty was management.

### 2. Time Spent Performing Exempt Work

A second consideration is the time Smith spent performing managerial tasks. Employees who "spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." 29 C.F.R § 541.700(b). However, there is no per se rule on this issue,

18

and "nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work." Id. Instead, "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." Id. Further, the FLSA specifically provides that retail executives are still eligible for the executive exemption even if they do not spend the majority of their time on managerial functions. Family Dollar I, 637 F.3d at 515–16 (citing 29 C.F.R. § 541.106); see also 29 C.F.R. § 541.700(c). "Thus, the amount of time spent on nonmanagement tasks is not dispositive, 'particularly when non-management duties are performed simultaneous to the supervision of employees or other management tasks and other factors support a finding that the employee's primary duty is managerial.'" Jones, 69 F. App'x at 637 (quoting Horne v. Crown Central Petroleum, Inc., 775 F. Supp. 189, 190 (D.S.C. 1991)).

Courts in the Fourth Circuit recognize a similar theory of "concurrent" or "simultaneous" duties—that is, when a store manager performs a mix of exempt and non-exempt work, that manager's primary duty can still be management so long as he remains responsible for supervising the store while performing non-exempt duties. For example, the Fourth Circuit held that a manager who performed many non-exempt tasks satisfied the "time" factor because she "perform[ed] management duties whenever she was in the store, even though she also devoted most of her time to doing the mundane physical activities necessary for its successful operation." Family Dollar I, 637 F.3d at 517. As the Fourth Circuit noted, "this multi-tasking—doing management jobs while doing nonexempt work—is explicitly recognized as managerial duty by the Department of Labor's regulations. . . ." Id.; see also Mayne-Harrison, 2010 WL 3717604, at *20–21 (noting that a store manager performed her management tasks while also simultaneously doing non-managerial work like stocking shelves, unloading trucks, cleaning, and running the cash register); Buechler, 2009 WL 3833999, at *5 (finding that a restaurant assistant manager was exempt based, in part, on evidence

19

that he supervised other employees while doing non-exempt work); see also Posely v. Eckerd Corp., 433 F. Supp. 2d 1287, 1302–03 (S.D. Fla. 2006) (summarizing the "overwhelming and well-reasoning precedent holding that retail store managers who are charged with maintaining the proper functioning of their stores are exempt employees under the FLSA").

Here, Smith states that he spent less that 15% of his time on personnel management and spent the "majority" of his time doing non-exempt tasks. Smith Declar. ¶ 6, ¶ 9. Further, Powers, Smith's former district manager, avers that store managers like Smith spent no more than sixty to ninety minutes per day scheduling workers, visiting with customers, or otherwise directly managing their stores. Powers Declar. ¶ 5. For its part, AutoZone assumes Smith spent more than 50% of his time doing non-exempt work, and argues that he nevertheless qualifies as exempt under the FLSA because he performed his management duties concurrently with any basic retail duties. AutoZone notes that Smith had authority to delegate tasks to himself or to other employees as he thought necessary, and was simultaneously responsible for managing the store at all times. Smith Depo. 35:13–18; 125:1–6; Odom Declar. ¶¶ 8–13.

Viewed in the light most favorable to Smith, this evidence shows he spent a significant amount of time—at least 85% of his day—performing non-exempt work. Yet, it is undisputed that Smith remained responsible for supervising hourly employees and otherwise managing his store during this time. Smith's own testimony shows that he developed daily and weekly task-lists, delegated completion of those tasks, and remained available to address management issues even while performing basic duties like cleaning the store, stocking inventory, and interacting with customers. As the Fourth Circuit observed in Family Dollar I, a manager who performs non-exempt tasks does so "in the context of [his] overall responsibility to see that the store operated successfully and profitably." 637 F.3d at 516. While Smith lists a broad range of nonmanagerial jobs he performed, he ignores the fact that "during 100% of the time, even while doing those jobs,

[he] was also the person responsible for running the store." Id. at 515. Notably, other retail managers who spent a similar amount of time performing non-exempt work have been found exempt as a matter of law. Family Dollar I, 637 F.3d at 514–16 (affirming summary judgment on FLSA overtime claim where the plaintiff-manager claimed she spent 99% of her time doing non-exempt tasks); Jones, 69 F. App'x at 637 (finding a restaurant manager exempt where she spent "75-80[%] of her time performing basic line-worker tasks"); Calvo v. B & R Supermarket, Inc., 63 F. Supp. 3d 1369, 1383 (S.D. Fla. 2014) ("Courts have repeatedly found the FLSA's managerial exemption satisfied even where the employee spent upwards of 80–90% of her day performing manual tasks alongside other, non-management employees, so long as the employee's primary role was management."); Buechler, 2009 WL 3833999, at *5 (finding that a restaurant assistant manager's primary duty was management where he spent 75% of his time performing nonmanagerial tasks); Mims v. Starbucks Corp., No. H-05-CV-0791, 2007 WL 10369, at *4 (S.D. Tex. Jan. 2, 2007) (finding store managers exempt even though they spent 70-80% of their time "waiting on customers and making them drinks, covering for absent or tardy baristas, operating the cash register, ensuring the store and restrooms remained clean and orderly, cleaning and maintaining the store equipment, and demonstrating the use of coffee makers, and other items sold by the [d]efendant"); Jackson v. Advance Auto Parts, Inc., 362 F. Supp. 2d 1323, 1334 (N.D. Ga. 2005) (finding store managers exempt despite evidence that they spent 90% of their time performing non-exempt tasks, including "selling, operating the register and cleaning the store"); Kastor v. Sam's Wholesale Club, 131 F. Supp. 2d 862, 865–67 (N.D. Tex. 2001) (finding that department manager's primary duty was management even though he claimed to spend 90% of his time "performing the exact same work as hourly employees"). Accordingly, despite Smith's claim that he spent the great majority of his time performing non-exempt duties, there is no genuine dispute that such duties were performed

simultaneously with his managerial functions. Under such circumstances, this factor also favors a finding that Smith's primary duty was management.

### 3. Relative Freedom from Direct Supervision

A third consideration involves Smith's relative freedom from direct supervision. Importantly, the test is one of "relative" freedom, not "complete" freedom. Thomas, 506 F.3d at 507 (noting that this factor "does not demand complete freedom from supervision, such that [an employee] is answerable to no one, as this would disqualify all but the chief executive officer from satisfying this factor of the primary duty inquiry"). "Even in situations where a supervisor, himself, is subjected to the close supervision of his superior, courts have routinely found that the supervisors responsible for the daily activities of their subordinates are vested with enough discretionary power and freedom from supervision to qualify for the executive exemption." Burson v. Viking Forge Corp., 661 F. Supp. 2d 794, 802 (N.D. Ohio 2009). As such, the issue is not whether "there were other people above [Smith] on the totem pole, but rather whether he had 'sufficient freedom from direct supervision.'" Smith, 115 F. Supp. 3d at 700 (quoting Pollard, 2011 WL 864329, at *8).[4]

Smith hangs his hat on this third factor, arguing that he had little discretion to make decisions because he was subject to strict oversight from the AutoZone corporate hierarchy. Specifically, Smith equates his position as something akin to a corporate drone who labored under the near-constant supervision of his district manager and AutoZone's detailed company policies. Smith suggests that district managers, rather than store managers, exercised real control over

---

[4] The DOL updated its overtime regulations in 2004. The pre-2004 regulations set out five factors that determine if an employee's primary duty is management. One of the pre-2004 factors—"the frequency with which the manager exercise discretionary powers"—was omitted from the updated 2004 regulations applicable to this case. Compare 9 C.F.R. § 541.700 (2004) with 29 C.F.R. § 541.103 (pre-2004). However, the Fourth Circuit has noted that the now-omitted "discretionary powers" factor overlaps with the "direct supervision" factor that remains in the post-2004 regulations. Jones, 69 F. App'x at 638. Absent contrary authority, the court will therefore consider evidence of Smith's discretionary powers in its analysis of his "relative freedom of supervision." See Green v. Harbor Freight Tools USA, Inc., No. 09-CV-2380, 2013 WL 4504316, at *11 (D. Kan. Aug. 23, 2013) (noting that "courts understand [the discretionary powers factor] to be incorporated into an analysis of an employee's "relative freedom from supervision").

individual AutoZone stores. This argument is buttressed by Powers' declaration, which states—albeit without elaboration or factual support—that AutoZone district managers had the most "discretionary authority regarding store management." Powers Declar. ¶ 6.

For its part, AutoZone admits that it used both detailed policy manuals and active oversight from district managers to guide store operations. Nevertheless, AutoZone argues that store managers retained significant authority to direct day-to-day operations. In particular, AutoZone notes that district managers supervised approximately seven to fifteen stores, making it impossible to exercise significant control over any one store manager.

Once again, the court finds AutoZone's arguments persuasive. It is well-accepted that "[a] managerial employee may come within the FLSA's executive exemption even where [his] discretion is circumscribed by corporate policies or [where that] employee reports to a supervisor." Byers v. Petro Servs., Inc., 110 F. Supp. 3d 1277, 1284 (S.D. Fla. 2015); Buechler, 2009 WL 3833999, at *6 (noting that a manager's "discretionary powers" are not diminished by the need to obey corporate policies and corporate superiors, or the need to seek pre-approval for certain decisions). The record shows that Smith was the highest-level employee responsible for his stores on a daily basis. Odom Declar. ¶ 5 ¶ 8. Smith managed between six and twelve employees—including a parts sales manager and sometimes a commercial manager—who reported directly to him. Id. at ¶ 7. Further, as described in Part IV.A.1 and Part IV.A.2 of this opinion, the undisputed facts show that Smith exercised discretion to make daily decisions about scheduling, employee supervision, customer relations, and inventory management. In many cases, Smith performed these duties without significant interference from AutoZone's corporate hierarchy.

To be sure, district managers were required to approve many important decisions, including the decision to hire, promote, discipline, terminate, or release employees when business was slow. Yet, the record reflects that Smith still had relative freedom to manage his store's personnel. For

23

example, while AutoZone's online "E-Hire" system pre-screened employment applications and required district-level approval for new hires, the undisputed facts show that Smith was trained as a hiring manager, proactively sought out new applicants for his stores, selected which applicants to interview, contacted references, decided which applicants to recommend to his district manager, and extended employment offers after they were approved. Smith Depo. 81:24–90:5; 93:7–94:18; see also Ex. 19, ECF No. 23-3, at 104–08 (describing the division of duties between hiring and district managers in "E-Hire" system). As such, Smith was relatively free to perform his recruitment and interview duties in the way he thought best served the needs of his store. See Pollard, 2011 WL 864329, at *8 (noting that courts "uniformly reject arguments that an employee cannot be an exempt executive if he cannot make hiring or firing decisions or is subject to rigid supervision"); Haines, 939 F. Supp. at 450 (finding that a manger who could not hire, fire, or discipline without approval from corporate management still retained sufficient discretion over day-to-day activities to warrant executive exemption).

Smith also had relative discretion in employee scheduling. AutoZone's automated "Z-Task" system created a skeleton schedule based on its estimate of the total labor hours required in a particular week, but store managers spent at least four hours a week finalizing the schedule. Odom Depo. 8:2–23; 18:17–25:19; Smith Depo. 65:10–17; Smith Declar. ¶ 19. While a district manager had to approve Smith's proposed schedule before it was posted, Smith had authority to assign specific duties to individual employees and adjusted the schedule if employees were unexpectedly absent. Odom Depo. 15:20–16:14; Odom Declar. ¶ 13; Smith Depo. 65:18–66:17. As such, the mere fact that Smith's power was cabined by corporate oversight does not negate evidence that Smith exercised considerable managerial control within the parameters set by AutoZone. Indeed, the detailed procedures used by most retail companies "may circumscribe but [do] not eliminate the discretion of the on-site manager of an isolated store who is responsible for day-to-day operations."

24

Murray v. Stuckey's, Inc., 50 F.3d 564, 570 (8th Cir. 1995); see also Itterly v. Family Dollar Stores, Inc., 606 F. App'x 643, 648 (3d Cir. 2015) ("The existence of detailed corporate policies likewise does not render [a store manager's] managerial work any less important. Courts have recognized that such corporate policies are commonplace, particularly in large retail chains, and do not render the managers subject to those policies nonexempt."); Calvo v. B & R Supermarket, Inc., 63 F. Supp. 3d 1369, 1385 (S.D. Fla. 2014) (noting that "the managerial exemption is applicable to employees who exercise sufficient discretion within the confines of even strict employer policy").

Smith finds it significant that district managers frequently visited his store, sometimes as often as four days a week. Evidence of particularly onerous oversight by district managers is certainly relevant, and can preclude summary judgment in some cases. See, e.g., Smith v. Heartland Auto. Servs., Inc., 418 F. Supp. 2d 1129, 1137 (D. Minn. 2006) (denying a defendant's motion for summary judgment where the company's district managers "were at the stores almost every day of the week for hours at a time" and kept in "seemingly constant contact" with store managers). However, the record in this case shows that the frequency of district manager visits fluctuated based on the district manager involved, were limited by the district managers' need to manage the other seven to fifteen stores in their district, and tended to increase when Smith's store failed to meet corporate sales goals. Odom Declar. ¶¶ 3–4; ¶ 8; ¶ 19; Smith Depo. 118:12–120:20. Further, while Smith regularly communicated with his district managers via phone, he estimates these calls lasted approximately four to ten minutes and states they were often meant to "keep [the district manager] in the loop" on activities in the store. Smith Depo. 117:4–122:3. This level of contact between Smith and his district managers—while notable—is comparable to other cases in which store managers have been found exempt as a matter of law. Thomas, 506 F.3d at 507–08 (finding that store manager had "relative freedom from supervision" because district manager's "weekly visits, frequent calls and emails, [and] constant availability" did not affect the store manager's ability to

25

operate free from supervision when the district manager was not present); Leonard v. Dolgencorp Inc., No. 4:10-CV-57-H, 2011 WL 2009937, at *8 (W.D. Ky. May 23, 2011) ("None of the [d]istrict [m]anager's various forms of oversight or assistance—weekly visits, frequent calls and emails, or constant availability—demonstrate that [a store manager] did not have "'relative freedom from direct supervision."'"); Langley v. Gymboree Operations, Inc., 530 F. Supp. 2d 1297, 1303 (S.D. Fla. 2008) "[E]ven if the [district manager] circumscribed Plaintiff's discretion to a large degree by issuing instructions to Plaintiff, including instructions from a corporate manual, that would not negate the fact that Plaintiff was charged with the task of ensuring daily compliance with corporate policy or with instructions from the [district manager]."); Horne, 775 F. Supp. at 191 (noting that a store manager "was relatively free from direct supervision" where her "supervisor came by her store only a few times a week").

Moreover, the number of visits by Smith's district managers is not as informative as those managers' evaluations of Smith's job performance. As described above, Smith's performance reviews encouraged him to exercise more discretion and to be more assertive in the management of his store. For example, one 2007 performance review asked Smith to delegate more duties to his subordinates, increase his mentoring of employees, and hold them accountable when they failed to meet expectations. Ex. 18, ECF No. 23-3, at 103. Later reviews praised Smith's ability to motivate his employees, his success in leading stores through drops in sales performance, and his proactive steps to stay attuned to the business needs of the communities his store served. Exs. 25 & 26, ECF No. 23-3, at 143–50. These same reviews asked Smith to take even greater control over employee hiring and training, and faulted him when his store failed to participate in corporate promotions. Id.

In sum, the record in this case, even when construed in Smith's favor, shows that he was often the most senior employee present in his store, was expected and encouraged to exercise independent authority in his daily work, and had discretion to make management decisions within

26

the boundaries set by AutoZone's corporate framework. While Smith's authority was not unfettered, he exercised control over management duties on a sufficiently frequent basis to be "relatively free" from direct supervision. Accordingly, the undisputed facts show that, despite oversight from his district manager and control from detailed corporate policies, Smith operated without direct, over-the-shoulder supervision on a day-to-day basis. This relative freedom from supervision supports a finding that his primary duty was management.

### 4. Smith's Salary as Compared to Other Employees

Finally, the regulations call for an analysis of the relationship between Smith's salary and the salaries paid to other AutoZone employees. The Fourth Circuit focuses on two issues: (1) "whether the manager earned more, in absolute terms, than nonmanagerial employees" and (2) "whether the manager had the ability to influence the amount of her compensation." Family Dollar I, 637 F.3d at 517. In his deposition, Smith testified that his salary ranged from $40,000 to $45,000 annually. Smith Depo. 23:18–24:7. There is no evidence about the average salary earned by other employees at Smith's stores. However, Smith admits that he, as store manager, was the highest paid employee in the store. Id. at 28:3–5. Further, Smith agrees that he could receive a bonus (up to 10% of his salary) based on his store's sales performance. Id. at 26:9–28:5. The store manager was the only employee who received such a bonus. Id. As such, this final factor also favors a finding that Smith's primary duty was management.

### 5. Summary of Smith's "Primary Duty"

Considering the DOL factors as a whole, the record in this case clearly establishes that Smith's primary duty was management. Smith was the highest-ranking and highest-paid person in his store, was responsible for managing his store at all times, and was the person ultimately accountable for the store's performance. To be sure, there is evidence that Smith shared management duties with his district manager, and that many decisions required approval from

27

Smith's superiors. Smith was also subject to AutoZone's corporate policies and procedures. Nevertheless, the undisputed facts, including Smith's own testimony, show that he had relative freedom to manage his store on a day-to-day basis. Indeed, there can be no genuine dispute that Smith's leadership was critical to this success of his store. The court therefore concludes that AutoZone has satisfied the second prong of the executive exemption.

### B. Authority to Hire or Fire Employees

The final prong of the executive exemption requires evidence that an employee has "the authority to hire or fire other employees" or that "his suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(4). The record shows that Smith did not have final authority to hire, fire, or issue corrective actions to his employees. Instead, AutoZone gave its district managers ultimate authority over these personnel decisions.

Therefore, the only issue is whether Smith's "suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status" were afforded "particular weight." This regulation is phrased in the disjunctive—AutoZone need not show that Smith's recommendations on all personnel actions were given particular weight, only that his recommendations on one or more of the listed actions were given particular weight. Bacon v. Eaton Corp., 565 F. App'x 437, 439 (6th Cir. 2014); see also Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22122, 22131 (Dep't of Labor April 23, 2004) (final rule codified at 29 C.F.R. pt. 541) ("An employee who provides guidance on any one of the specified changes in employment status may

28

meet the section 541.100(a)(4) requirement.").[5]  To determine "particular weight," the regulations

provide the following guidance:

> To determine whether an employee's suggestions and
> recommendations are given "particular weight," factors to be
> considered include, but are not limited to, whether it is part of the
> employee's job duties to make such suggestions and
> recommendations; the frequency with which such suggestions and
> recommendations are made or requested; and the frequency with
> which the employee's suggestions and recommendations are relied
> upon. Generally, an executive's suggestions and recommendations
> must pertain to employees whom the executive customarily and
> regularly directs.

29 C.F.R. § 541.105. Relevant evidence can include: "(1) witness testimony that recommendations

were made and considered; (2) the exempt employee's job description listing responsibilities in this

area; (3) the exempt employee's performance reviews documenting the employee's activities in this

area; and (4) other documents regarding promotions, demotions or other change of status that reveal

the employee's role in this area." 69 Fed. Reg. at 22135.

Here, Smith's job description lists "attract[ing], recruit[ing], hir[ing], train[ing] and

develop[ing] high caliber store personnel" and "provid[ing] performance counseling and

distribut[ing] AutoZoner Action Reviews when necessary" as responsibilities of an AutoZone store

manager. Ex. 14, ECF No. 23-3, at 34. Smith's actual duties mirror this job description, as he

regularly interviewed new candidates for his store, made recommendations on hiring and

promotions, and completed performance evaluations on employees that were tied to pay raises.

Smith Depo. 83:3– 85:24; 103:17–112:14.[6]  As was true with inventory management and scheduling,

---

[5] While this regulatory preamble is not binding precedent, the court finds it persuasive because it "rests on a
body of experience and informed judgment to which courts and litigants may properly resort for guidance." Ramos v.
Baldor Specialty Foods, Inc., 687 F.3d 554, 561 (2d Cir. 2012).

[6] The parties dispute Smith's control over corrective actions. AutoZone suggests Smith had authority to issue
corrective actions without approval from his district manager. Specifically, AutoZone claims Smith "was responsible for
issuing corrective action and disciplining employees who did not follow AutoZone policies and procedures [but] was
permitted to seek feedback or assistance from his District Manger and/or the human resources department before
issuing a corrective action or discipline depending on the circumstances." Odom Declar. ¶ 17. In contrast, Smith claims
he had no authority to unilaterally discipline employees. Instead, he states that he reported violations to his district

29

Smith lacked final authority on many personnel issues, but he worked with his district manager and AutoZone human resources to address the various staffing issues that arose in his stores.

Smith's influence over hiring decisions is particularly telling. Smith admits that staffing and low employment numbers were challenges at each of his stores. Id. at 83:3–13. To address these issues, Smith attended various job fairs and vocational schools to encourage applicants to apply to AutoZone. Id. at 81:24–82:23. He also left his business card with potential applicants he observed in his day-to-day life; for example, if Smith saw a restaurant employee with good customer service skills, Smith would leave his card and encourage that person to apply to work for him. Id. Additionally, Smith was trained as a hiring manager, and had primary responsibility to screen new applications using the "E-Hire" system. After a new candidate submitted their initial application, Smith selected which applicants to interview, conducted the interview, contacted references, and ultimately decided which candidates to recommend to his district manager for final approval. Id. at 83:3–90:5. Importantly, AutoZone offers evidence—which Smith fails to refute—that Smith's district managers became involved in the hiring process only after Smith screened applications and decided which candidates to recommend. Odom Declar. ¶ 15. Once a district manager or human resources approved the new hire, Smith extended the employment offer to the applicant. Smith Depo. at 87:15–17.

This evidence shows that Smith played an important role in recommending new hires for his store. Smith actively encouraged candidates to apply, and had authority to screen which candidates were vetted for open positions. Only candidates he found acceptable were forwarded to his district manager for approval. This ability to "screen" new hires by choosing which applications to forward

---

manager, who then instructed him how to discipline the employee. Smith Depo. 109:4–112:1. In some cases, the district manager noticed employee infractions himself and contacted Smith with instructions to issue corrective actions. Id. at 47:8–49:15. At this stage, the court must accept Smith's evidence as true, and thus assumes that Smith had little independent authority over the corrective actions issued to his employees. Nevertheless, the undisputed evidence concerning Smith's role in other personnel decisions—namely hiring—can still satisfy the "particular weight" factor, notwithstanding the dispute about Smith's role in disciplining employees.

for approval supports a finding that Smith's hiring recommendations were afforded "particular weight." See In re Family Dollar FLSA Litig. [Family Dollar II], 998 F. Supp. 2d 440, 450 (W.D.N.C. 2014) (finding "particular weight" factor satisfied where the plaintiff "effectively controlled which candidates were presented for possible [d]istrict [m]anager approval"); Pollard, 2011 WL 864329 at *10 (finding that managers "had sufficient input in the hiring, firing, and promotions to justify their exemptions" where the managers screened applicants and determined whether they would continue in the application process).

Indeed, Smith's own performance evaluations highlight the importance of his hiring recommendations. One performance review notes that Smith "quickly made improvements in staffing & execution" after taking over at several stores. Ex. 24, ECF No. 23-3, at 142. A subsequent review states that Smith was able to improve sales based, in part, on his ability to "properly staff his store with a diverse team of [employees]." Ex. 26, ECF No. 23-3, at 147. Yet another performance review states that Smith was "Behind" on staffing objectives because he failed to "recruit bilingual [employees] to better batch & attract [his] customer base." Ex. 25, ECF No. 23-3, at 144. Other reviews make similar comments about the need for Smith to recruit bilingual employees. Exs. 26 & 27, ECF No. 23-3, at 148, 153. Taken together, this evidence shows that AutoZone depended on Smith to identify and recommend high-quality candidates to work in his store.

In an attempt to minimize his role in hiring, Smith claims that his hiring recommendations were not always followed, and were thus not afforded "particular weight." Specifically, Smith notes that AutoZone "needed employees . . . badly" and argues that his recommendations could be afforded "particular weight" only if AutoZone "hired everyone I recommended." Smith Declar. ¶ 5. However, the regulations are not so demanding. Rooney v. Town of Groton, 577 F. Supp. 2d 513, 531–32 (D. Mass. 2008) ("It is not necessary for the exempt employee to play a role in every single

31

hire, fire, or promotion."); see also Pollard, 2011 WL 864329, at *10 ("[Each plaintiff] recommended employees and *at least one person* . . . recommended [by each plaintiff] was hired. Thus, the Court finds that each [p]laintiff had sufficient input in the hiring, firing, and promotions process to justify their [executive] exemptions.") (emphasis added); Buechler, 2009 WL 3833999, at *6–7 (finding assistant manager exempt where he conducted initial interviews and tracked employee performance and a supervisor acted on his personnel recommendations from "time to time"). Accordingly, evidence that Smith's hiring recommendations were not accepted 100% of the time does not mean that those recommendations were not afforded particular weight.

To be sure, the frequency with which Smith made recommendations on personnel decisions, and the frequency with which those recommendations were followed, are relevant considerations. 29 C.F.R. § 541.105. For example, Smith estimates that his recommendations on pay raises were followed by his district managers only 30% of the time, while his recommendations on promotions were followed "less than half the time." Smith Depo. 33:9–34:6; 85:3–13; Smith Declar. ¶ 14. Standing alone, this evidence favors Smith's claim that his personnel recommendations were not afforded "particular weight."

However, Smith concedes that his hiring recommendations were followed at a greater rate— over 50% of the time—than were his recommendations on pay raises and promotions. Smith Depo. 85:3–86:22. Smith further admits that in the minority of cases in which his hiring recommendations were not accepted, many candidates were automatically rejected because they failed a criminal background check. Id. The frequency with which Smith's hiring recommendations were made and approved—considered alongside his exclusive role in screening applicants and completing performance evaluations tied to employees' pay raises—satisfies the particular weight requirement. Family Dollar II, 998 F. Supp. 2d at 450 ("While [plaintiff] may not have had the ultimate decision making authority with respect to hiring for her entire tenure, it is undisputable that she controlled

32

the screening process and at least some of her recommendations as to hiring, promotion and termination were closely followed."). As such, the undisputed facts show that AutoZone has satisfied the final element of the executive exemption test.[7]

<h1 style="text-align:center">V.</h1>

In sum, the court finds that AutoZone has satisfied its burden to establish that Smith meets each of the elements of the executive exemption test under the FLSA. Because the court concludes that Smith falls within the executive exemption, it need not address AutoZone's claim that Smith also falls within the FLSA's administrative exemption. Nickell v. City of Lawrence, Kan., 352 F. Supp. 2d 1147, 1164–65 (D. Kan. 2004) ("Since the court has found that the [p]laintiffs are executive employees exempt from the overtime provisions of the FLSA, thereby awarding summary judgment to the [d]efendant, the court will not address the parties' arguments regarding the applicability of the administrative exemption."). Accordingly, the court concludes that Smith's claim for overtime compensation under the FLSA fails as a matter of law. Smith's motion for summary judgment, ECF No. 19, is therefore **DENIED**, and AutoZone's motion for summary judgment, ECF No. 21, is **GRANTED**.

An appropriate Order will be entered.

---

[7] In so holding, the court acknowledges that the Ninth Circuit recently reversed a decision granting summary judgment for AutoZone on similar claims. In that case, the district court held that AutoZone store managers qualified as exempt executives under the FLSA. Taylor v. AutoZone Inc., No. 10-CV-08125-PTC, 2012 WL 254238, at *7 (D. Ariz. Jan. 27, 2012). A panel of the Ninth Circuit subsequently reversed, holding that conflicting evidence precluded judgment as a matter of law. Taylor v. AutoZone, Inc., 572 F. App'x 515, 516 (9th Cir. 2014) (unpublished). For several reasons, the court does not find Taylor controlling. First, the panel opinion is relatively brief, and offers little insight into what "conflicting evidence" warranted reversal of the district court. Second, the Ninth Circuit's decision was decided without reference to Family Dollar I, Jones, and other Fourth Circuit precedent that controls this court. Third, Taylor was conditionally certified as a collective action by the district court, and the summary judgment record in that case was burdened with evidence from a wide range of parties, including multiple store managers from across the country. In contrast, the record here involves evidence from a single store manager in Virginia. Finally, FLSA exemption claims are necessarily fact-specific, and Smith has offered no evidence that the facts in Taylor mirror those in his case. See Family Dollar I, 637 F.3d at 512 (noting that courts "cannot assume" that facts from an earlier FLSA action are identical to those in later actions, even where a later case involves the same employer and similarly-situated plaintiff-employees). Accordingly, this court does not find that Taylor precludes summary judgment on the facts presented here.

Entered: 05-13-2016

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge